IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSEPH BARBOA, aka
JOSEPH SANDOVAL,

     Plaintiff,

 vs.         No. CIV 03-126 WPJ/LFG

JOHN SHANKS, et al.,

     Defendants.

## MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION[1]

THIS MATTER comes before the Court on the Motion for Summary Judgment [Doc. 62] and Martinez Report [Doc. 64] filed on May 7, 2004 by Defendants Correctional Medical Services ("CMS") and Maurine Fire ("Fire"); as well as the requests for dismissal or summary judgment included in the Martinez Reports filed on May 7, 2004 by Defendants Sandra Penn ("Penn") and Addus Healthcare, Inc. ("Addus") [Doc. 61], and by Defendants John Doe Palmer ("Palmer"), James Lopez ("Lopez"), Phillip Mares ("Mares") and John Doe Houges ("Houges") [Doc. 65].

Plaintiff Joseph Barboa ("Barboa") was granted an extension of time to respond to these

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

Reports and Motion, and he filed his Response [Doc. 70] on July 12, 2004.[2]  Defendants Penn and

Addus filed a Reply [Doc. 71] on July 29, 2004.

All Defendants have now requested dismissal or summary judgment based on their Martinez

Reports and the Motion for Summary Judgment filed by CMS and Fire, and Barboa has responded.

In the order directing submission of Martinez Reports, the parties were advised by the Court pursuant

to Hall v. Bellmon, 935 F.2d 1106 (10th Cir. 1991), that their submissions could be used in deciding

whether to grant summary judgment, and they were advised to submit whatever materials they

consider relevant to the claims [Doc. 57].

The requests of all Defendants for summary judgment or dismissal are now ready for ruling.

For the reasons given below, the Court recommends that CMS and Fire's Motion for Summary

Judgment [Doc. 64] be granted, and that summary judgment be entered in favor of all Defendants.

## Summary of Plaintiff's Factual Allegations[3] and Legal Claims

Barboa is a prisoner proceeding *pro se* who seeks relief under 42 U.S.C. § 1983, based on

allegations that he was denied proper medical care while in prison in violation of his Eighth

Amendment right to be free from cruel and unusual punishment, and in violation of state medical

negligence law.  Certain claims and defendants were dismissed by the Court in an order dated April

14, 2003 [Doc. 11].  Eight defendants remain.

---

[2] On August 18, 2004, Barboa filed two additional documents [Docs. 75 and 76], purporting to respond to the Martinez Reports and requests for summary judgment.  These documents are untimely and were filed in violation of the Court's August 5, 2004 order [Doc. 74], denying Barboa's motion for extension of time.  These filings will not be included in the Court's consideration of the summary judgment matter.

[3] A detailed chronology of facts pertinent to Barboa's claims, with references to the record, is attached to the end of these Findings and Recommended Disposition.

Barboa was incarcerated in the Santa Fe North Facility at the Penitentiary of New Mexico ("PNM") from 2000 until his transfer to the Long Term Care Unit ("LTCU") at the Central New Mexico Correctional Facility ("CNMCF") on June 14, 2002. During his time at PNM, Defendant Penn, a medical doctor, and Defendant Fire, a physician's assistant, provided him with medical care and treatment, and Penn continued to treat him after the transfer.

Defendant CMS employed Fire during the time she provided direct care to Barboa at PNM. Penn was employed by Defendant CMS until CMS ceased providing medical services to the Department of Corrections when its contract expired on June 30, 2002. Defendant Addus took over as medical and dental care provider for the Department of Corrections on July 1, 2002, and Penn began working for Addus on that date. Defendants Palmer, Lopez, Mares and Houges are employees of the New Mexico Department of Corrections.

In his complaint, Barboa states that he was shot between the eyes on March 17, 1998, an incident which resulted in the loss of his left eye, a broken jaw, and numerous facial fractures. He says he still has bullet fragments lodged in his face and that he suffers from brain damage and post-traumatic stress syndrome as a result of the shooting.

Barboa alleges that during his incarceration he has suffered numerous and increasingly painful and worrisome symptoms, many of them arising from the 1998 gunshot wound. He claims that Defendants continually denied and delayed his requests for pain relief, intentionally delayed his referral to outside medical specialists, interfered with his medical care, caused him to remain on narcotic pain killers which are damaging his liver, caused him to be incarcerated under conditions which exacerbate his post-traumatic stress disorder, failed to supply required CT scan records to an outside specialist, and failed to intervene to stop a known pattern of interference with his medical

treatment.

Barboa alleges that CMS and Addus, both of which are private medical companies under contract at different times with the Corrections Department, had in place customs or policies that encouraged their medical staff to deny Barboa and other prisoners adequate medical care.  He also alleges that CMS failed to train its personnel properly.

Barboa seeks compensatory and punitive damages from Defendants and an injunction directing Defendants to remove two bullet fragments from his face.  Defendants deny the allegations of the complaint and assert certain affirmative defenses.

## **Discussion**

### I.
### Standards for Summary Judgment

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine

issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986);

<u>Biester v. Midwest Health Servs, Inc.</u>, 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the

motion may not rest upon the mere denials of his pleadings to avoid summary judgment. Fed. R. Civ.

P. 56(e); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).

"The mere existence of a scintilla of evidence in support of the nonmovant's position is

insufficient to create a dispute of fact that is 'genuine.'" <u>Lawmaster v. Ward</u>, 125 F.3d 1341, 1347

(10th Cir. 1997). Summary judgment can be entered only if there is insufficient evidence for a

reasonable jury to return a verdict for the party opposing the motion. <u>Anderson</u>, 477 U.S. at 249,

106 S. Ct. at 2511. Thus, the Court's inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." <u>Id.</u>, at 251-52, 106 S. Ct. at 2512. The Court in considering a motion for

summary judgment construes the factual record and the reasonable inferences therefrom in the light

most favorable to the party opposing the motion. <u>Foster v. Alliedsignal, Inc.</u>, 293 F.3d 1187 (10th

Cir. 2002).

As noted above, Barboa is proceeding *pro se*. Pleadings submitted by a *pro se* litigant are to

be liberally construed. <u>Haines v. Kerner</u>, 404 U.S. 519, 520, 92 S. Ct. 594, 596 (1972). But while

the Court must liberally construe a *pro se* plaintiff's factual allegations, the Court cannot supply

additional facts, nor apply legal theories for plaintiff that assume facts that have not been pled or

proved. <u>Dunn v. White</u>, 880 F.2d 1188, 1198 (10th Cir. 1989). Conclusory allegations will not

suffice to defeat summary judgment, <u>Harvey Barnett, Inc. v. Shidler</u>, 338 F.3d 1125, 1136 (10th Cir.

2003), and the Court will not construct an argument for a *pro se* plaintiff absent a coherent discussion

of the issue in question. <u>Drake v. City of Ft. Collins</u>, 927 F.2d 1156, 1159 (10th Cir. 1991).

II.

Standards for Determining Eighth Amendment Violations

Barboa alleges that the medical treatment he received while incarcerated in New Mexico corrections facilities violated his constitutional rights.  Under certain conditions, denial or delay of medical treatment to a prisoner can constitute cruel and unusual punishment in violation of the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976).

The "deliberate indifference" standard has two components, one objective and one subjective. Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321 (1991).  In order to prevail on his Eighth Amendment claim, a plaintiff must make a two-part showing:  (1) that the medical need was "sufficiently serious," and (2) that the offending officials acted with a culpable state of mind in that they knew or should have known about the serious medical need and intentionally refused to provide medical care.  Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994).

Defendants' burden on summary judgment is to show that there is no genuine issue of material fact with regard to each of these two elements.  If Defendants make that showing, Barboa must counter with evidence demonstrating that there are factual issues sufficient to take to the jury on the two elements of seriousness and culpability.

A medical condition is "serious" for purposes of the Eighth Amendment if it is one "that  a reasonable doctor or patient would find important and worthy of comment or treatment . . . [or if it] significantly affects an individual's daily activities or . . . [includes] the existence of chronic and substantial pain."  Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996).  A delay in providing medical treatment to a prisoner can constitute an Eighth Amendment violation, but only if the prisoner shows that the delay resulted in substantial harm.  Olson v. Stotts, 9 F.3d 1475, 1477 (10th

Cir. 1993); White v. Colorado, 82 F.3d 364, 366 (10th Cir. 1996).

The second element, "culpability," requires an intentional refusal to provide medical care, or something more significant than mere negligent diagnosis or inadvertent failure to provide care. Wilson v. Seiter, *supra*, 501 U.S. at 297. Instead, the plaintiff must establish a "sufficiently culpable state of mind" to support his claim of denial of a constitutional right. Handy v. Price, 996 F.2d 1064, 1067 (10th Cir. 1993).

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.

Estelle v. Gamble, *supra*, 429 U.S. at 105-06.

Bearing in mind these summary judgment and Eighth Amendment standards, the Court turns to Barboa's claims of constitutional violations.

### III.
### Defendants Have Met Their Burden of Showing
### No Genuine Issue of Material Fact as to Eighth Amendment Violations

Plaintiff alleges Eighth Amendment violations against two categories of Defendants: medical providers and corrections officers.

> Our cases [dealing with medical care in the prison context] recognize two types of conduct constituting deliberate indifference. First, a

7

> medical professional may fail to treat a serious medical condition properly. Where this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent . . . . The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment.

Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000).

Although the eight Defendants submitted three separate Martinez Reports, the Court groups the Defendants into the above-described two categories for purposes of discussing the propriety of summary judgment: (A) the medical providers and their employers (Penn, Fire, CMS and Addus); and (B) the corrections officers and officials (Palmer, Lopez, Mares and Houges).

A. Defendants Penn, Fire, CMS and Addus

Defendant Penn and her current employer, Addus, filed an extensive Martinez Report [Doc. 61] as well as a reply [Doc. 71] to Plaintiff's response to the Martinez Report. They ask that the Court grant summary judgment in their favor on the basis of these documents. Defendant Fire and her former employer CMS (also the former employer of Penn) also filed an extensive Martinez Report [Doc. 64] in response to the Court's directive, as well as a Motion for Summary Judgment and memorandum in support [Docs. 62-63].

The Court finds that Defendants Penn, Fire, CMS and Addus have met their summary judgment burden of establishing the lack of a genuine issue of fact as to whether they were deliberately indifferent to Barboa's suffering. Barboa failed to meet his burden of rebutting this showing, and summary judgment should therefore issue in favor of these Defendants.

8

1.   *Allegations Against Defendant Penn*

Barboa identifies Sandra Penn as a medical doctor at PNM, formerly employed by CMS and currently employed by Addus.  [Complaint, at ¶ A3.  In her Answer, Penn acknowledges that she is currently employed as Medical Director and works for Addus.  [Answer of Penn and Addus, Inc., Doc. 20, at ¶ A(3)].

Barboa alleges that Penn refused to prescribe any pain medication for him in approximately April 2001, when he returned from a visit with an offsite physician, Dr. Fiber, without receiving any relief from his symptoms including earache and a "ball" or mass on the roof of his mouth. [Complaint, at ¶ B4-5].  He says that Penn also refused, on the orders of Defendant Mares, to "give him a lay-in," which the Court takes to mean a medical provider's note allowing Barboa to miss work or other scheduled prison activities.  [Complaint, at ¶ B6].  Barboa alleges further that he repeatedly filed grievances and submitted sick-call slips complaining of increasing facial pain, but Penn refused to issue him any pain medication.  [Complaint, at ¶ B7].

Barboa also asserts, without giving any details, that Penn "never went to examine" him on December 18, 2001.  He is presumably referring to the occasions when, he says, a filling fell out of his tooth [Complaint, at ¶ B16].  He alleges further that Penn denied him proper medical care in an unspecified way, apparently between the April 2001 visit to Dr. Fiber and his second visit to that doctor in April 2002.  [Complaint, at ¶ B17].  He states that on May 20, 2002, Penn gave him pain medication which did not relieve his pain, and on June 1, 2002, she stopped altogether giving him any pain medication.  [Complaint, at ¶ B19-20].

Finally, he claims that on an unspecified date, Penn failed to order an x-ray or "pass medical records," failed to offer pain medication, and intentionally delayed referring Barboa for outside

specialized treatment.  [Complaint, at ¶ C3].

### 2. *Allegations Against Defendant Fire*

Barboa alleges in his complaint that Defendant Fire was a physician's assistant employed by Defendant CMS and working at the Santa Fe North Facility at PNM during the time Barboa was incarcerated there.  He states that Fire was responsible for performing regular physical examinations of inmates at the facility.  [Complaint, at ¶ A6].  His complaints against Fire are very similar to those he brings against Penn.

Barboa alleges that, sometime after April 2001, Fine refused to prescribe any pain medication for him when he returned from a visit with outside physician Dr. Fiber.  [Complaint, at ¶ B5].  Fire also allegedly refused, on the orders of Defendant Mares, to "give him a lay-in."  [Complaint, at ¶ B6].  Barboa also alleges that Fire denied him proper medical care in an unspecified way, apparently between the April 2001 visit to Dr. Fiber and his second visit to that doctor in April 2002. [Complaint, at ¶ B17].  Finally, he claims that on an unspecified date, Fire  failed to order an x-ray or "pass medical records," filed to offer pain medication, and intentionally delayed referring Barboa for outside specialized treatment.  [Complaint, at ¶ C3].

### 3. *Allegations Against Defendant CMS*

Barboa states that CMS is a private medical company contracting with the State Corrections Department to provide medical care to inmates.  He alleges that CMS created a custom or policy of encouraging its medical staff to deny Barboa and other prisoners adequate medical care.  He also alleges that CMS employs medical personnel who are inadequately trained in medicine.  [Complaint, at ¶ A14].

As noted above, Defendants Fire and Penn were employed by CMS at various times pertinent

to this lawsuit and were involved in providing medical care to Barboa while he was incarcerated in New Mexico corrections facilities.  [Doc. 63, at ¶ 75].  As also noted above, Defendant Penn was employed by CMS until the CMS contract was taken over by Addus on July 1, 2002.  [Doc. 63, at ¶78 and Ex. DDDD].

### 4. *Allegations Against Defendant Addus*

Barboa states that Addus, Inc. is a private contractor supplying medical personnel and services to the State Penitentiary.  He alleges that Addus employees, including Penn, failed to provide him adequate medical care, that its nurses are not adequately trained, and that Addus is responsible for delays in providing him needed surgery to remove bullet fragments.  He further alleges that Addus created customs and policies that encourage inadequate medical care to prisoners.  [Complaint, at ¶ 15].

### 5. *The Court Finds No Genuine Issue of Material Fact as to These Defendants*

The Court assumes, without deciding, that Barboa's medical needs were sufficiently serious to meet the Eighth Amendment "cruel and unusual" standard.  *See*, Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (one factor to be considered in determining seriousness is "the existence of chronic and substantial pain"); Fowler v. Hodge, 94 Fed. Appx. 710, 2004 WL 618070. at *2 (10th Cir. Mar. 30, 2004) ("Assuming the chronic pain plaintiff reported satisfies the harm requirement").

Even assuming Barboa established the first element of his claim for cruel and unusual treatment, summary judgment must still be granted on his claims against Penn, Fire, CMS and Addus, as these Defendants have shown as a matter of law that they did not have the requisite culpable state of mind necessary for an Eighth Amendment violation.

As discussed above, it is only deliberate indifference to serious medical needs of prisoners that

violates the Eighth Amendment's proscription against cruel and unusual punishment.  Ramos v. Lamm, 639 F.2d 559, 574-75 (10th Cir. 1980).  This means that the plaintiff must show that the defendant against whom such a claim is brought intended unnecessary and wanton infliction of pain or engaged in actions repugnant to the conscience of mankind.  Estelle v. Gamble, *supra*, 429 U.S. at 105-06.

When a plaintiff "at most alleges a difference of opinion between himself and the medical staff concerning the necessary scope of his medical treatment," the Eighth Amendment standard is not satisfied.  Ogden v. San Juan County Detention Center, 104 F.3d 368 (Table, text in Westlaw), 1996 WL 688305, at *9 (10th Cir. Dec. 2, 1996).

> The prisoner's right is to medical care – not to the type or scope of medical care which he personally desires.  Coppinger v. Townsend, 398 F.2d 392, 394 (10th Cir. 1968).  Diagnostic techniques or forms of treatment are matters for medical judgment and do not represent cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. at 106. [Internal punctuation omitted].

Id., at *9.  A "quarrel with the doctor as to treatment" does not raise a constitutional issue.  Handy v. Price, *supra*, 996 F.2d at 1067.

A detailed review of Barboa's medical records establishes that his complaints about his medical providers essentially amount to quarrels with his doctors and other providers about how to properly care for his chronic pain and other medical ailments.  Even if the providers were negligent in treating Barboa, an issue the Court need not decide, Barboa has nevertheless utterly failed to rebut Defendants' showing that they were not "deliberately indifferent" to his suffering.  Indeed, the record shows that Defendants Penn and Fire treated Barboa appropriately and did all they could to alleviate his pain and to treat the other medical symptoms of which he complained.    Specifically, with regard

to Defendant Penn:

Barboa alleges that Penn refused to provide him pain medication upon his return from a visit with Dr. Fiber sometime in April 2001, refused to give him a "lay-in," and ignored his repeated grievances and sick-call slips complaining of increasing facial pain.  The record (as discussed in detail in the attached chronology) shows that it was Penn who put in a request in March 2001 that Barboa be sent for a consultation with offsite ENT specialist Dr. Fiber and that, after Barboa returned from that appointment, she put in a request for a CT scan as recommended by Dr. Fiber.  There is no indication in the record that Penn refused any request to provide pain medication to Barboa in the period after his appointment with Dr. Fiber.  On the contrary, the record is replete with evidence that Penn did everything she could to help Barboa find relief from his pain symptoms.

Penn adjusted his pain medication continuously throughout the period in question, trying different prescriptions to accommodate his changing complaints regarding location and intensity of his pain.  She tried giving him trigger point injections for pain, without success.  She gave Barboa a pass to wear a head cover outside during cold weather in an attempt to alleviate his pain symptoms, referred him to outside ENT and neurological specialists, ordered numerous lab tests and radiological exams, and suggested and supported the MDTT[4] meeting in which representatives from several prison service department met to devise a plan on how best to manage Barboa's medical, psychological and educational situations at the prison.  It was Penn who eventually requested that Barboa be transferred to the LTCU so that he could be more closely monitored and his chronic pain symptoms managed more efficiently.

---

[4]The acronym "MDTT" has not been set out in full in the record, so the Court does not know what this stands for.  However, the meeting is described above, and the Court will use this term or the term "unit meeting" to refer to the conference as described.

It is clear from the record that Barboa's medical case is a difficult one. This would be true of any patient suffering from chronic pain, whether or not the patient is incarcerated. The Court can find no evidence in the record that Penn demonstrated deliberate indifference to Barboa's frequent and aggressive demands that his pain be relieved. The record shows, in fact, that Penn treated him appropriately and with compassion. In addition, there is nothing on the record to indicate that Barboa ever requested a "lay-in," nor that Penn refused this request.

When Barboa returned from his visit with Dr. Fiber in April 2001, Penn made a note of the visit, including a review of Dr. Fiber's findings and a note to check with his office in four days, if his written report had not been received by that time. There is no evidence to support Barboa's assertion that Penn refused him pain medication during the period after he returned from Dr. Fiber's office. The record does show that Barboa submitted several sick-call requests in April and May, complaining of various problems including a need for refill of stomach medications as well as ointment for his artificial eye, a rash, a "feeling of weakness," and a bad odor in his drinking water. A note of one of these requests states that Barboa's scheduled appointments were canceled numerous times and "rolled over" due to security shutdowns. On May 5, 2001, he refused treatment.

None of Barboa's sick-call slips during this period demonstrate urgent medical needs or life-threatening situations, and the fact that his appointments with medical personnel may have been delayed due to security concerns in the institution does not support his claim that Defendant Penn was deliberately indifferent to his suffering.

Barboa also claims that Penn "never went to examine" him on December 18, 2001 when, he says, a filling fell out of his mouth and because medical help was not forthcoming, he attempted to commit suicide. The record as to the events of December 18, 2001 is as follows:

14

At approximately 8:30 a.m. that morning, Defendant Fire examined Barboa, and that one of his many complaints was, "I have a cavity that fell out." Fire gave Barboa some Naprosyn (an anti-inflammatory drug with analgesic properties), noted that he would be seeing Dr. Penn "next visit," and noted further that an MDTT meeting would be proposed at the next provider meeting.

Around 9:00 p.m. that evening, according to Barboa's grievance, he asked a corrections officer to "get me medical," as he was having pain and a missing dental filling. He says a delay in receiving medical care following this request caused him to "flip out" and attempt suicide. The record shows that security was called to his cell at 10:45 p.m., when he was found to have a superficial self-inflicted wound to the left wrist.

This wound was appropriately treated by nursing staff; the on-call physician was called and orders were given (this doctor may have been Dr. Penn – the record does not say); psychiatric service was called; and Barboa was placed in therapeutic seclusion, on suicide watch. Fire examined him the next day and treated his wound, which was again described as superficial. Prison grievance authorities noted that an MDTT meeting had been scheduled in order "to deal with his issues more effectively."

There is no indication that Penn was involved in the December 18, 2001 episode, other than possibly giving treatment orders over the phone. When Barboa was treated by the nursing staff that night for his self-inflicted wound, the staff noted in his record that he refused further suggested treatment, including pain relief measures and antidepressant medication. There is nothing on the record to indicate that Penn treated Barboa with deliberate indifference on or around December 18, 2001 for any complaints having to with his missing filling.

Barboa's other claims against Penn are either too vague to support his assertion of

15

constitutional violations or are unsubstantiated by record evidence.  He asserts that Penn "denied him proper medical care" in an unspecified way presumably between April 2001 and April 2002.  There was a long delay between the first visit to Dr. Fiber in April 2001, at which the doctor asked that CT scans be performed on Barboa, and the second visit to Dr. Fiber in March 2002.  When Barboa returned from the April 2001 visit, Penn put in a request for CT scans, a request which was initially refused by CMS.  She also noted Dr. Fiber's assessment that nothing abnormal was found in Barboa's mouth, and she continued to treat the alleged "ball" condition conservatively.  Indeed, Barboa had many visits with medical providers between April 2001 and the end of the year but made no complaints about the "ball" in his mouth until approximately September.  When his requests to see a specialist again grew insistent in late 2002 and early 2003, Penn sought another appointment with Dr. Fiber.

The record shows that Penn's treatment of Barboa during the period from April 2001 to April 2002 was in keeping with good medical practice and did not rise to a level of deliberate indifference. This conclusion is bolstered by the affidavit of William M. Shannon, M.D., submitted by Defendant CMS, Penn's employer during the period in question.  It is Dr. Shannon's medical opinion that the medical care rendered to Barboa "was appropriate to his medical presentation and at times met and/or exceeded the standard of care recognized in the community."  [Doc. 63, Ex. FFFF].

Barboa also alleges that on May 20, 2002, Penn gave him pain medication which did not relieve his pain, and that on June 1, 2002, she stopped giving him pain medication altogether.  The record does not show that Penn examined Barboa on May 20, 2002.  However, she did see  him in May and June and continued to adjust his medications, as follows:

On May 2, Barboa complained to Penn about his Neurontin prescription, saying he thought

the medication affected his memory and was causing kidney damage.  Penn ordered lab tests, discontinued the Neurontin, and ordered a different pain medication.  On May 29, Penn examined Barboa for complaints of ear pain.  She discontinued Tylenol 3 medication at this point and instituted Darvocet.  She also requested that Barboa be put on a morphine-based painkiller, but this request was not approved by her superiors.

On May 31, 2002, Penn performed a medication review and discussed Barboa's case with another physician.  On this date, she also put in a request that Barboa be transferred to the LTCU for management of his chronic pain.  On June 2, Penn discontinued Barboa's prescription for Darvocet, because he complained to her that it made him feel forgetful and paranoid.  These actions do not amount to a refusal to provide Barboa necessary pain medication, nor do they constitute deliberate indifference to his suffering.

Finally, Barboa alleges that Penn failed to an order an x-ray, failed to "pass medical records," failed to offer pain medication, and intentionally delayed referring him for outside specialized treatment.  The Court has difficulty evaluating this claim, as Barboa gives no dates for these alleged actions.  It is not the Court's function to search the record to supply facts consistent with potential claims or to apply legal theories which have not been pled.  Dunn v. White, *supra*.  Barboa failed to demonstrate the existence of a material issue of fact on this claim.

Rather, the record shows that throughout her treatment of Barboa, Penn ordered numerous laboratory tests, including radiological tests; that she continued to adjust his pain medication appropriately, if at times without success; and that she took steps to ensure that all of his medical records were "passed" to outside specialists and that the specialists' records were received at the prison.  The record does not support Barboa's claims of deliberate indifference in these matters.

17

In sum, the Court finds that summary judgment should be entered in favor of Defendant Penn.

Barboa's allegations against Defendant Fire are nearly identical to the ones he lodges against Penn.  He states, first, that Fire refused to prescribe any pain medication for him when he returned from a visit with Dr. Fiber in April 2001, that she refused (presumably also at this time) to give him a "lay-in," and that she denied him proper medical care in an unspecified way apparently between April 2001 and April 2002.

As noted above, Barboa's medical treatment may have been delayed during April and May 2001 due to security shutdowns; however, the nature of his complaints during this period and the reasons for the delay tend to negate his assertions of deliberate indifference.  In any event, there is no showing that Fire was responsible for the delays.  There is nothing on the record to show that Fire refused Barboa pain medication upon his return from the Fiber appointment in April 2001.  The record indicates that the first time Fire examined Barboa after that appointment was on May 16, 2001 for complaints regarding eye medications, medications for epigastric pain, "lumps" in his side and triceps, and increasing fatigue.  There is nothing to show that, during this appointment with Fire, Barboa complained of pain related to his visit with Dr. Fiber or requested medication for the bullet-fragment problem for which he had been referred to Dr. Fiber.  At this visit, Fire prescribed eye ointment, eye wash, "Artificial Tears," and medication for Barboa's digestive problems.  She also ordered lab tests and requested an evaluation by Dr. Penn of Barboa's "lumps."  Her treatment of Barboa during the post-Fiber appointment period does not demonstrate deliberate indifference.

As was true with Barboa's allegations against Penn, there is nothing on the record to indicate that Barboa requested, or that Fire refused, to give him a "lay-in"; nothing to support his vague and conclusory allegation that Fire denied him proper medical care in an unspecified way between April

18

2001 and April 2002; nothing to show that she failed to order an x-ray, to "pass medical records," or to offer pain medication; and nothing to show that she intentionally delayed referring Barboa for outside specialized treatment. In addition, Barboa has not established that Fire, a physician's assistant and not a doctor, was responsible for ordering referrals to offsite specialists. Barboa's conclusory statements are insufficient. Rather, it was incumbent on Barboa to submit legally admissible evidence supporting his conclusions. This he failed to do.

The Court finds that summary judgment is appropriate in favor of Defendant Fire.

Barboa's allegations against CMS and Addus are that these corporate defendants created customs and policies of encouraging their medical staffs to deny Barboa adequate medical care, and that they employed medical personnel who were not adequately trained in medicine. Barboa also alleges that Addus is responsible for delaying needed surgery to remove bullet fragments from his face.

The Court has already found, as a matter of law, that Defendant Penn, a physician, and Defendant Fire, a physician's assistant, were not deliberately indifferent to Barboa's suffering. There is no indication that either Penn or Fire was inadequately trained nor that, even if they were, such alleged inadequate training had any effect on the care Barboa received from these employees. Barboa makes a vague allegation that nursing staff employed by CMS and Addus were inadequately trained, but he has presented no evidence to support this allegation. The Court may not rely on Barboa's unsupported guess, speculation or conjecture.

There is, further, nothing more than Barboa's conclusory allegations that either of the two corporate Defendants created customs or policies encouraging inadequate medical care to prisoners. "Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to

oppose summary judgment." Elsken v. Network Multi-Family Security Corp., 49 F.3d 1470, 1476 (10th Cir. 1995).

Finally, delay in providing surgical removal of the bullet fragments cannot form the basis of a deliberate indifference claim. The medical providers who treated Barboa, both in prison and offsite, agreed that surgical removal was not warranted and in fact might even be dangerous. The record on this point is as follows.

In April 2001, Barboa saw Dr. Fiber, an ENT specialist, who noted that he could not find a fistula or mass in Barboa's mouth. Dr. Fiber did find some "softness" in the soft palate and asked that a CT scan be done. It is unclear from the record whether a CT scan was ever done by prison medical providers in response to this request, although some CT scans were sent to Dr. Fiber in February 2002. Following the April 2001 visit, Penn made notes of Dr. Fiber's findings, including the fact that on examination he found Barboa's mouth to be essentially normal.

In September and October, Barboa was still complaining about the bump in his mouth. Penn examined his mouth again on October 5, 2001 and felt a "small prominence" in the palate which she said "feels physiologic – no mass or fistula." She did not see the need for referral to a specialist at that time. In November and December, Barboa submitted requests for medical care, continuing to complain about "that ball in the inside of my mouth." He was examined by both Penn and Fire during this period, but they found very little inside Barboa's mouth that was abnormal, other than some tenderness.

Barboa continued to complain about what he called a "ball" in his mouth. On February 20, 2002, he told Penn that he wanted surgery for removal of the "ball." Penn had Barboa's CT scan records sent to Dr. Fiber and arranged for another offsite examination by Dr. Fiber, which occurred

in March 2002.  At this time Dr. Fiber said he could "feel the edge of the bullet," and he ordered 3-dimensional CT scans of the sinus and palate area.  These were done on April 17 and showed multiple bone and bullet fragments in Barboa's face.  On April 8, 2002, Barboa was sent for another offsite visit to neurologist Michael Baten for evaluation of his pain symptoms.  Dr. Baten found that Barboa had sustained an injury to his trigeminal nerve and noted that Barboa was receiving appropriate treatment for his condition.

When Barboa was transferred to the LTCU in June 2002, he was examined by a CMS doctor who questioned whether the 3D CT scan results were "amenable to surgical correction." Barboa was seen again by Dr. Fiber on July 17, 2002.  Dr. Fiber stated that surgical removal of the bullet fragment in Barboa's hard palate "might be helpful," although it was not causing any inflammation or irritation. Dr. Fiber also stated, however, that removal of the fragment from the "perimandibular pterygoid area" was "out of the question and contraindicated" as it could damage the facial nerve.

In July and again in December 2002, Barboa expressed mental anxiety to psychiatric providers over the fact that prison authorities were not providing surgery to remove the bullet fragments.  Dr. Featherstone at LTCU discussed Dr. Fiber's findings with Barboa in August 2002, noting that Dr. Fiber had recommended against surgery.  Barboa asked for a second opinion.  He was eventually sent to UNM Hospital for this second opinion in January 2003.  The surgeon who examined him at the UNM Otolaryngology Clinic did not feel a bullet fragment or any mass at the points indicated by Barboa.  He ordered a CT scan of the face.

Barboa was seen again at the UNM clinic in March, but a mixup with his medical records at UNM resulted in the examination being repeated in August, 2003.  At that time, the chief of the otolaryngology division examined him and felt a firm bony mass in his palate.  He ordered a new CT

scan, which was done in September 2003.  Barboa returned to UNM in October, at this time insisting upon surgery.  The surgeon who examined him then felt bullet fragments at the hard palate and in the soft tissue which, however, did not produce pain when manipulated.

The UNM doctor did not agree with Barboa that the bullet fragments were the cause of the pain he was experiencing, and he explained to Barboa that surgery to remove the fragments could cause facial nerve injury, persisting pain and a scar.  Two UNM surgeons conferred and concluded, as of February 2004, that "there is absolutely no reason to operate on these bullet fragments" given the risks involved.  Barboa was instead referred to the UNM Pain Clinic for help in managing his pain.

These facts indicate that, at most, there was a difference of opinion between Barboa and his doctors over the efficacy and safety of surgical removal of the bullet fragments.  The two UNM doctors agreed that surgery was not necessary, would probably not help the pain symptoms, and entailed unacceptable risks which outweighed any possible benefits.  Dr. Fiber essentially reached this same conclusion, although he did say that surgical removal of one fragment from the hard palate might be useful, though it was not necessary.  Defendants CMS and Fire submitted the affidavit of Dr. William M. Shannon, who gave his medical opinion that the "ball" in Barboa's mouth was evaluated and treated appropriately, and that "there was no medical necessity for removing the bullet fragments from Plaintiff's facial area."

Barboa has not come forth with evidence to rebut Defendants' showing that surgical removal was contraindicated, other than his own opinion that he felt surgery would help his symptoms.  This is not sufficient to prevent summary judgment, and the Court finds no genuine issue of material fact as to liability of the corporate Defendants for any constitutional violation based on delay in providing surgical removal of the bullet fragments.

In sum, the Court finds that Barboa has not rebutted the showing of the four medical Defendants and finds there is no genuine issue of material fact with regard to the allegations against these Defendants.  Instead, the record shows that Barboa has received extensive, continuous and appropriate medical, dental and psychiatric care during the period relevant to his complaint and that he has not always been compliant with the medical advice he has been given.  Indeed, his case is similar to that of Lawrence Handy, in which the Tenth Circuit noted:

> The record does not even approach establishing a denial of adequate medical care, much less an issue relating to a culpable state of mind, i.e., a deliberate indifference with respect to Handy's medical conditions.    It shows precisely the opposite.    Handy's medical records show that he is a prodigious user of the medical facilities and services . . . . available through the Department of Corrections . . . . A page-by-page review of Handy's medical records indicates a degree of medical treatment which would be envied by the majority of the adult population of this country which is not incarcerated . . . . In the face of a record showing the abundant medical treatment which Mr. Handy has received while in the custody of the Colorado Department of Corrections, it is an understatement to say that actions like this are a significant and unwarranted burden on the defendants, on the state, and on the courts.

Handy v. Price, *supra*, 996 F.2d at 1067, 1068.

    B.  Defendants Palmer, Lopez, Mares and Houges

Defendants Palmer, Lopez, Mares and Houges are employees of the New Mexico Department of Corrections.  They submitted a joint Martinez Report [Doc. 65].  These Defendants seek dismissal of Barboa's complaint on grounds he failed to exhaust his administrative remedies.  In the alternative, they argue that the record establishes as a matter of law that they were not deliberately indifferent to Barboa's medical needs.  The Court finds that summary judgment is appropriate in favor of these Defendants.

1.   *Allegations Against Palmer, Houges, Lopez and Mares*

Barboa identifies Defendant Palmer as a correctional lieutenant on duty on December 18, 2001 and in charge of section 3A of the "A.P.A. Unit," which he identifies as the housing unit for prisoners with mental problems at PNM's North Facility.  He states that Palmer was responsible for supervising and disciplining all corrections officers in the 3A Unit.  Barboa identifies Defendant Houges as a correctional officer, on duty on December 18, 2001 in the North Facility.  [Complaint, at ¶¶ A11, A12].  He alleges that when a filling fell out of his tooth on December 18, 2001, Palmer and Houges intentionally delayed medical treatment for this condition, causing Barboa to attempt to commit suicide.  [Complaint, at ¶ B14].

Barboa identifies Defendant Lopez as the Correctional Unit Manager at the North Facility, in charge of the A.P.A. Unit and responsible for conducting unit management meetings, supervising and disciplining all corrections officers in the 3A-3B Units, and evaluating and answering inmate grievances.  [Complaint, at ¶ A8].  He claims that Lopez "repeatedly intentionally interfered with plaintiff's medical care, denied plaintiff access to medical care and encouraged his officers to do the same."  [Complaint, at ¶ B12].  He does not give the names of these officers, dates of these occurrences, or exactly what transpired on any of these alleged occasions.  Later in his complaint Barboa alleges, again in only vague terms, that Lopez interfered with or denied him medical care for "many days." [Complaint, at ¶ 17].

Barboa identifies Defendant Mares as the Associate Warden at the state penitentiary, responsible for programs and in charge of the supervision and discipline of all corrections staff at the penitentiary's North Facility.  [Complaint, at ¶ A5].  Barboa alleges that Mares ordered Defendants Penn and Fire not to give him a "lay-in" even though he was having trouble doing his homework.

[Complaint, at ¶ B6]. He does not give a date for this alleged action. Barboa asserts further that Mares failed to correct the problem of officers under his supervision delaying, denying, and intentionally interfering with his prescribed medical care. [Complaint, at ¶ B13]. He does not state which officers were taking these delaying and interfering actions, exactly what they did, how Mares responded, or the dates when these events allegedly occurred.

### 2. *The Court Finds No Genuine Issue of Material Fact as to These Defendants*

#### (a) *Failure to Exhaust*

The Corrections Department defendants raise the argument that Barboa failed to exhaust his administrative remedies with respect to the claims against them and assert that the entire complaint must therefore be dismissed without prejudice under provisions of the Prison Litigation Reform Act ("PLRA").

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement is designed to: (1) allow prison officials an opportunity to satisfy the inmate's complaint, thus reducing the burden on the judicial system; (2) filter out some frivolous claims; and (3) create an administrative record to facilitate review of cases eventually brought to court. Porter v. Nussle, 534 U.S. 516, 525, 122 S. Ct. 983 (2002).

Earlier this year, the Tenth Circuit held that the PLRA's exhaustion requirement was one of "total exhaustion," which means that the presence of any unexhausted claims in a prisoner's Section 1983 complaint compels a district court to dismiss the prisoner's lawsuit in its entirety without prejudice. Ross v. County of Bernalillo, 365 F.3d 1181, 1189 (10th Cir. 2004). In the Ross opinion,

the court analogized the PLRA's exhaustion requirement to the total-exhaustion rule established in Rose v. Lundy, 455 U.S. 509, 510, 102 S. Ct. 1198 (1982), applicable to habeas cases brought by state prisoners under 28 U.S.C. § 2254.

In such cases, the court is obligated to dismiss an entire habeas petition if any of the inmate's claims have not been completely exhausted in the state court system.  An exception to this mandatory dismissal rule comes in cases where denial of the unexhausted claims would result in the entire habeas petition being denied on the merits.  Moore v. Schoeman, 288 F.3d 1231, 1235 (10th Cir. 2002). This Court assumes that the Tenth Circuit intends the same exception to apply in PLRA cases in which the plaintiffs mixes exhausted with unexhausted claims.  See, Ross, supra, at 1189 n.11, 1190 n.13.

In the present case, the Court recommends dismissal of all claims against the Corrections Department defendants, for the reasons given below.  It therefore declines to decide whether or not these claims have been exhausted, because dismissal of these claims means that the entire lawsuit can be decided on the merits at this point.

(b) *Merits of Plaintiff's Claims Against Corrections Defendants*

Barboa claims that corrections officers and prison officials intentionally delayed or interfered with his access to medical care while incarcerated.  Such a claim can constitute a constitutional violation, in certain circumstances.

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced,

> deliberate indifference to a prisoner's serious illness or injury states a
> cause of action under § 1983.

Estelle v. Gamble, *supra*, 429 U.S. at 104-05.  The Court finds that, in this case, circumstances do not warrant a finding that prison employees intentionally denied or delayed Barboa's access to medical care nor that they intentionally interfered with his treatment once prescribed.

(i) <i>Defendants Palmer and Houges</i>

Barboa claims that corrections officers Palmer and Houges intentionally delayed calling for medical care for Barboa on December 18, 2001, the day a filling fell out of his tooth.  He says that this delay led him to attempt to commit suicide.

The record with regard to the events of December 18, 2001 has been described above and is set out in more detail in the attached Chronology.  It does not appear from the record that Barboa submitted a sick-call slip on the evening of December 18, although in a grievance filed two days later he says that evening he asked a corrections officer, whom he does not name, to call medical services for him.  He says he told this officer that he was suffering from pain in his left jaw and a migraine headache, and also told the officer that a filling that had fallen out of his tooth.  The grievance goes on to state that this unnamed officer called the shift lieutenant, also unnamed in the grievance, who told Barboa to "hang on" as he was going to call medical services.  However, Barboa says, "I waited about 45 minutes, medical never arrived nor did an officer come to let me know what was the hold up."  In apparent frustration at this lack of attention, Barboa made some cuts to his left wrist which are described in the records as superficial.  Stitches were not required, and Barboa refused psychiatric treatment that night.

It appears that the two corrections officers described in the grievance are Palmer and Houges.

There is insufficient evidence to make a definitive conclusion, but assuming for purposes of argument that the two officers so described are indeed Palmer and Houges, Barboa fails to raise a constitutional issue against these individuals.  A 45-minute delay in receiving medical treatment does not amount to cruel and unusual punishment under the circumstances described by Barboa, even viewing the facts in the light most favorable to his claims.

As noted above, a delay in providing medical treatment to a prisoner can constitute an Eighth Amendment violation, but only if the prisoner shows that the delay resulted in substantial harm, and that the defendants intended an unnecessary and wanton infliction of pain.  Olson v. Stotts, *supra*, 9 F.3d at 1477; White v. Colorado, *supra*, 82 F.3d at 366.  On December 18, 2001, Barboa was complaining of a lost filling, pain in his jaw, and a migraine headache.  These problems are not the sort of conditions such as "broken bones or bleeding cuts" – that is, emergency conditions – which if not treated immediately could lead to substantial harm and would prompt a court to conclude that deliberate indifference was involved.  In any event, the delay was not inordinately long in this case. *See*, Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995) ("Some delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay"); and Farrow v. West, 320 F.3d 1235 (11th Cir. 2003) (15-month wait for dentures violated the Eighth Amendment, under the circumstances).

In an affidavit submitted as an attachment to his Martinez Report, Defendant Lopez states that he has been employed in various corrections positions with the New Mexico Department of Corrections for approximately 17 years.  He says, based on his experience as a corrections administrator, that it is normal for an inmate requesting medical attention to have to wait a period of up to two hours before medical staff can see him.  [Doc. 65, Ex. C].

28

It certainly cannot be pleasant to wait an hour or more with a painful jaw, with a headache (Barboa has never been diagnosed with typical migraine headaches), and with worry about a lost filling. However, the one hour and 15 minute wait to which Barboa was subjected on December 18, 2001 does not lead the Court to conclude that any prison official, including Palmer and Houges (assuming they were involved in this incident at all, which has not been shown), were guilty of wantonly and unnecessarily inflicting pain on Barboa. That is the constitutional standard, and Barboa has failed to present facts sufficient to meet that standard. Summary judgment is appropriate in favor of Defendants Palmer and Houges.

(ii)  *Defendant Lopez*

Barboa claims that Defendant Lopez, the then-Unit Manager at PNM's North Facility, repeatedly intentionally interfered with Barboa's medical care, denied Barboa access to medical care, and encouraged his officers to do the same. These claims are extremely vague as to date, names of the officers who were allegedly so encouraged by Lopez, or exactly what Lopez is alleged to have done or not done.

Lopez meets Barboa's claims with a detailed affidavit, discussing various grievances filed by Barboa which mention or include allegations against Lopez. Lopez gives his version of the events about which Barboa complains in these grievances. An examination of the grievances, along with Lopez's affidavit and arguments, leads the Court to conclude that the claims against Lopez should also be dismissed on summary judgment.

As noted in the attached chronology, Barboa submitted a lengthy grievance on December 29, 2001 complaining about Lopez's behavior toward him at a meeting in Lopez's office on December 28, 2001. Barboa says that Lopez had him brought in for an interview after he had made several

requests for medical treatment for head pain and the "ball" in his mouth, and that Lopez "played mind games" with him in this interview and asked him cruel questions.

Lopez states in his affidavit that Barboa's version of the facts of December 28, 2001 is essentially accurate, although he denies that his questions were motivated by cruelty and states he was not "playing mind games" with Barboa. Rather, Lopez says, he asked Barboa questions to try to determine how best to find help for his medical problems and that he attempted to provide reassurance to Barboa to prevent him from causing continued disturbances with the medical staff, corrections staff and other inmates.

Both parties agree that Lopez asked Barboa what he thought could be done to ease his pain, and told him the staff was going to have an interdisciplinary team meeting (presumably the MDTT) in about two weeks to assist Dr. Penn in meeting his medical needs. The two parties further agree that this discussion did not have the desired effect, that Barboa was not soothed, and Lopez says he therefore had Barboa escorted immediately to the infirmary. Barboa claims he was never seen by medical that day; however, the record shows that he was in fact seen by medical staff shortly after the meeting with Lopez.

Lopez says that his interaction with Barboa on December 18, 2001 was motivated by his desire to prevent Barboa from becoming a security threat or causing further disturbances. He says that he did not intend to cause delay or interfere with Barboa's medical treatment in holding the brief interview and notes that, indeed, Barboa received expedited medical assistance that day because Lopez ordered that he be taken to the infirmary immediately after the meeting. The Court will not resolve disputed issues of fact, nor will it choose any particular inference over another, in considering a motion for summary judgment. In this instance, however, it is clear that there is only

one reasonable inference to be drawn from the record with regard to the December 28, 2001 meeting between Lopez and Barboa, which is that Lopez was not deliberately indifferent to Barboa's suffering on that date.

The record establishes that Barboa was making emphatic and repeated demands for immediate medical attention for problems which were not urgent or life-threatening, that immediate medical attention was not available at that moment, that Lopez had Barboa brought to his office for an interview, that Lopez asked Barboa what the prison could do to help him with his pain, that some other conversation took place between the two at that meeting which Barboa characterizes as "mind games" and which Lopez says were attempts to gather information and provide reassurance, and finally that Barboa was escorted to the infirmary for medical treatment immediately after the meeting.

Barboa's grievance was denied by the grievance officer and the denial was upheld on appeal, Deputy Secretary of Operations John Shanks finding that Barboa was being seen by medical providers on a regular basis, and his claim of being denied medical treatment was unfounded. As discussed above, Barboa's medical records support this finding.

There is nothing in these facts that would raise an inference of cruel and unusual treatment on the part of Defendant Lopez. Looking at the facts in the most favorable light for Barboa, as the Court must in considering summary judgment, the Court concludes that no reasonable jury could find that Lopez's behavior violated evolving violated standards of decency or interfered with Barboa's medical care. Rather, Lopez's behavior was consistent with that of a responsible prison official attempting to deal with a potentially disruptive situation, and it expedited rather than delayed Barboa's access to medical treatment for his complaints of pain on December 28, 2001.

On January 8, 2002, Barboa filed two more grievances, again complaining of Lopez's actions

31

at the December 28, 2001 meeting and complaining that prison staff was refusing to schedule his MDTT meeting in a timely manner.  He includes in one of these grievances further allegations of statements he says Lopez made at the December 28 meeting, including the statement that "medical wasn't going to do anything for me," and that instead several prison officials including medical providers, mental health, and others were going "have a team meeting and decide if I should have this bullet taken out," but that no such meeting was ever set up.  Barboa also complains about Lopez making decisions concerning his medical care, when Lopez is not a doctor.

In response to this grievance, Lopez interviewed Barboa and told him the MDTT meeting had been scheduled and would take place on January 16, 2002, and that the purpose of the meeting was not to make arrangements to have the bullet removed but was, rather, to assist Dr. Penn in getting an appointment for a second opinion on appropriate treatment.  This grievance was denied on appeal, because the meeting had been held to discuss resolution of Barboa's numerous grievances, and "[n]o recommendation was made to have the bullet removed from your jaw."

This grievance does not raise an issue of fact as to whether Lopez treated Barboa in a cruel and inhumane manner.  Barboa's claim in this grievance is internally contradictory, in that he says Lopez told him that "medical wasn't going to do anything" for him, but he also states that Lopez said the meeting had been scheduled so that prison officials, including medical officers, could decide the best course of medical treatment for him.  By the time the grievance was resolved on appeal, the meeting had taken place and a plan of action had been mapped out.

As Lopez argues, the team meeting itself did not hinder or delay Barboa's medical care; rather, its purpose was to expedite and make it more effective.  Barboa was free to continue to seek day-to-day medical treatment at the prison, whether or not the meeting took place, and the record

shows that he did just that.  Even if Lopez had made the alleged statement that "medical wasn't going to do anything," this did not have any effect on Barboa's continuing to ask for and receive medical care at the prison and does not, under the circumstances of this case, constitute cruel and unusual punishment.

Barboa filed another grievance on February 26, 2002 which mentions Defendant Lopez.  In this grievance, he claimed that Lopez delayed or interfered with his medical care the preceding day.  Barboa says that his repeated requests for medical attention in the afternoon of February 25 resulted in his being escorted to Lopez's office again, where Lopez questioned him and once again played "mind games" with him, delaying his access to medical treatment.  The record shows that Barboa was seen by medical at 2:35 p.m. that day with complaints of pain and was given a pain reliever.  At 3:30 p.m. that day, he notified a corrections officer that he was in pain and asked the officer to call medical.  The officer did so and was told by medical staff that Barboa would be seen at regular rounds that evening.  Barboa did not believe that the officer had actually called medical services.  He became angry at this and began shouting and causing a disturbance.

Lopez says he had Barboa brought into his office, where he did indeed question him again.  In his report in response to Barboa's grievance, Lopez says that Barboa was angry when he was brought in, cursing and yelling at the corrections officers, and that he attempted to assault Lopez at one point but was prevented from doing so by corrections officers.  Barboa does not confirm that he attempted to physically attack Lopez.  Both parties agree that Lopez spoke with Barboa, asked him what the problem was and offered him an aspirin.  They further agree that Lopez suspended Barboa's privileges, based on his behavior that day.  Lopez says the disciplinary sanction was ordered because Barboa was abusive to him and to other staff, yelling obscenities and threatening physical violence.

Barboa says the action was taken because he refused to answer Lopez's questions, and because the officers' intentional delay in obtaining medical care for him caused him to "go crazy" with pain, a condition which was exacerbated by Lopez's "mind games."

Lopez says that after the interview in his office, he directed officers to escort Barboa to medical, and that he himself went to speak with the medical staff about Barboa. The record shows that Barboa spent seven minutes in Lopez's office on February 25, and that after the interview he was taken to medical and was examined by Dr. Penn. She attempted to alleviate his pain with a trigger point injection but this was unsuccessful, and she made notes in the record regarding further avenues to be explored in the effort to provide pain relief for Barboa.

The record does not establish that Lopez caused, or encouraged his officers to cause, a delay in Barboa's medical treatment on February 25, 2002. Barboa was making urgent, noisy and insistent demands for medical treatment just a few hours after he had been seen by a medical provider. Barboa admits that he "yelled" at a sergeant to get him medical, and that he continued to ask three other officers to call for medical care, even though he was told he would be seen in a few hours' time.

There is nothing cruel or unusual in a prison official's action in having a disruptive inmate brought to his office for questioning under these circumstances. The record shows that Barboa was in Lopez's office for seven minutes; this is not an inordinate delay in providing medical treatment. Aside from a vague reference to "mind games," there is no indication, even in Barboa's grievance, that Lopez behaved abusively toward him on this occasion. Barboa was in fact escorted to the medical services at the end of the interview and, because of Lopez's intervention, he was treated by a medical provider at 6:00 p.m., one to three hours earlier than he would otherwise have been seen.

The Court finds that no reasonable jury would decide, on these facts, that Lopez delayed or

interfered with Barboa's medical treatment, nor that his behavior was outside the bounds of decency or deliberately indifferent.  Summary judgment should issue on behalf of Defendant Lopez.

(iii) *Defendant Mares*

Barboa's complaints against Mares are that on an unspecified date he ordered Defendants Penn and Fire not to give Barboa a "lay-in" even though he was having trouble doing his homework, and that Mares failed to correct officers under his supervision who were delaying, denying, and intentionally interfering with Barboa's prescribed medical care.  Barboa does not name these officers, nor does he give dates or specific actions or nonactions of Mares which demonstrated deliberate indifference.

As was true with Barboa's claim that Defendants Penn and Fire failed to give him a "lay-in" on Mares' orders, there is nothing on the record to support this vague allegation.  No date is given, no grievance appears on the record, and Barboa provides the Court with no reason to conclude that Mares' order that Barboa be deprived of a "lay-in," if Mares indeed issued such an order, violated constitutional standards proscribing cruel and unusual punishment.  As stated above, vague, conclusory allegations are not sufficient to defeat summary judgment.  The other allegations against Mares are equally vague.  Barboa states only that Mares intentionally delayed and interfered with his access to medical care and encouraged other unnamed corrections officers to do the same.  As Lopez did, Mares points to the only grievances filed by Barboa which could conceivably refer to him, in an attempt to fill in the factual background and to meet Barboa's charges.

On January 8, 2002, Barboa submitted a grievance stating that he talked to Defendant Mares about his medical complaints on that date.  It is unclear whether this grievance is directed at Mares' actions, as it states only that Mares was not aware that a unit meeting had been planned, or scheduled,

35

to discuss Barboa's medical situation.   In the "Relief Requested" section, Barboa states:

> I request to be transported to a institution where I could receive
> adequate medical care and I be given pain medication until a doctor
> removes this bullet.   And that the Grievance Officer receives
> assistance from A.W. Phillip Marez [Mares] for the fact Mr. Lopez
> and caseworker are unqualified to make decisions concerning my
> medical issues.  I also hope some one care about my health and not
> just their own interest.  [Some misspellings corrected].

[Doc. 65, Ex. 2 to Ex. C].  The grievance was denied, as the unit meeting had indeed been scheduled

at which Barboa's medical condition was discussed and plans for his care were formulated.  This

grievance does not clarify the allegations against Mares and gives the Court no basis for finding that

Mares was deliberately indifferent to Barboa's suffering by intentionally interfering with Barboa's

access to medical care or, that he caused or encouraged others to do so.     On October 13, 2002,

Barboa filed another grievance mentioning Mares.  In this grievance, Barboa complains that a pair

of tennis shoes which had been mailed to him were sent back to the vendor, because of a change in

mail policy decreed by Mares.  Barboa says that he was told by the prison physical therapist in April

or May 2002 that he had bursitis in his hip, and this condition may have been caused by the shoes he

was wearing.  He stated that because he did not receive the new tennis shoes, he now suffers

permanent damage to his hip, foot, knee and shoulder.  [Doc. 65, Ex. B].  The grievance was denied,

and the denial was upheld on appeal, Deputy Secretary Shanks stating that Barboa's request for

tennis shoes was rejected because Barboa failed to follow established policy.

Mares argues that this particular claim – that he interfered with medical care for Barboa's hip

– was not alleged in the complaint.  Rather, he says, Barboa's complaint focuses on inadequate

medical care and interference by officials related to headaches and facial pain caused by residual bullet

fragments.  The Court agrees and finds that the events discussed in this grievance are not relevant to

the lawsuit.  Even if they had been included as part of the case, Barboa fails to present evidence that his hip problem was sufficient "serious" to trigger Eighth Amendment protection.  In addition, a finding of deliberate indifference requires that the official "knows of and disregards an excessive risk to inmate health or safety;  the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, supra, 511 U.S. at 837.  Barboa has not demonstrated an issue of fact as to whether Mares knew or should have known about his hip condition and any connection between that condition and Barboa's need for new tennis shoes.

And because Barboa has failed to establish that provision of medical care at the prison was delayed or denied, Mares cannot be liable for encouraging such delays or denials on the part of prison staff.  In sum, Barboa has not raised a genuine issue of material fact on the question of whether Defendant Mares delayed, denied or interfered with his receiving adequate medical care, as alleged in the complaint.  Summary judgment is therefore appropriate in favor of Mares.

C.  Conclusion

The record indicates that Barboa suffers from chronic pain.  The record is equally clear that his prison medical providers are treating him appropriately for his medical conditions.  While there may have been occasional delay in providing medical care or perhaps medical judgments were made, in the long course of treating Barboa in prison, that might have been done somewhat differently, the Court can find nothing in this extensive record which rises to the level of a constitutional violation.  There is simply no evidence to raise an issue of fact as to whether that any of the eight defendants engaged in behavior offensive to "evolving standards of decency," as required for a claim of cruel and unusual punishment under the Eighth Amendment.  Estelle v. Gamble, 429 U.S. at 105-06.

Barboa's complaints "wrongly perceive the Constitution as a micromanager of day-to-day prison activities, and a guarantee of prisoner preferences over those of prison officials." <u>Handy v. Price</u>, *supra*, 996 F.2d at 1068.  The Court finds that all of the Defendants in this case have established as a matter of law that they were not deliberately indifferent to Barboa's serious medical needs.  Summary judgment is appropriate in favor of all Defendants on all of Barboa's federal claims.

IV.
<u>State Law Claims</u>

Barboa's complaint is based not only on federal civil rights law but also includes supplemental state law tort claims based on allegations of medical negligence.  28 U. S. C. § 1367(c) provides that a district court may decline to exercise supplemental jurisdiction over state law claims if the court dismisses all claims over which it has original jurisdiction.  Indeed, the Tenth Circuit holds that dismissal in these circumstances is preferable to retention of jurisdiction.  <u>Board of County Comm'rs v. Geringer</u>, 297 F. 3d 1108, 1115 n. 6 (10th Cir. 2002).

> [T]he most common response to a pretrial disposition of federal claims has been to dismiss the state law claim or claims without prejudice – that is the seminal teaching of [here the court cites Supreme Court and Tenth Circuit precedent].  There are of course the best of reasons for a district court's deferral to a state court rather than retaining and disposing of state law claims itself  – such factors . . . as judicial economy, fairness, convenience and comity . . . Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.

<u>Ball v. Renner</u>, 54 F. 3d 664, 669 (10th Cir. 1995).

If the Court accepts the recommendation to dismiss Barboa's federal claims, it should decline to exercise supplemental jurisdiction over his state law claims, which should be dismissed without prejudice.  28 U. S. C. § 1367(c)(3); <u>Bateman v. City of West Bountiful</u>, 89 F. 3d 704, 709 n. 5 (10th

Cir. 1996); <u>Thatcher Enterprises v. Cache County Corp.</u>, 902 F. 2d 1472, 1478 (10th Cir. 1990).

<u>**Recommended Disposition**</u>

That the Motion for Summary Judgment [Doc. 62] be granted, and that summary judgment

be entered in favor of all Defendants on all of Plaintiff's claims.


Lorenzo F. Garcia
Chief United States Magistrate Judge

39